May it please the Court, my name is Charlotte Herring and I'm appearing on behalf of Petitioner Jermaine Thomas. Jermaine was born to a United States soldier on a United States Army base, yet we're here today because the United States government is seeking to deport him from the United States. This case arises out of immigration removal proceedings, but it can't be answered by looking at the Immigration and Nationality Act or any other statute. Instead, the question before this Court today is whether Jermaine's birth on that base to that soldier occurred in the United States for purposes of the 14th Amendment's Citizenship Clause. I've planned to talk about two things with my time today. First, I'd like to discuss the analytical framework that we believe the Court should use to answer the question before it. And secondly, I'd like to briefly highlight the key facts and legal considerations that I believe are critical to this Court's analysis. Tell us what you do with the Nolis case, which seems to me to be almost exactly on point. Yes, Your Honor. In Nolis, the Fifth Circuit was faced with the case of an outlying possession or a territory, the Philippines. Our position is that this case, the military base, is distinguishable from all of the territory line of cases, Nolis, Rabang, Lamonti, from the Ninth, Second, and Third Circuits, because there are key and critical intrinsic differences in a military base versus a territory. Both this case and the Nolis decision in the Philippines in general involved a treaty, separate treaties. The Treaty of Paris, by which the Philippines was ceded to the United States, placed the political status or the citizenship determination over residents of the Philippines explicitly in the hands of Congress. The language of the Treaty of Paris states, Congress shall determine the political status of inhabitants in all of the island territories ceded at that time, including the Philippines. In this case, the language of the treaty, the NATO Status of Forces Agreement, does not do that, does not task Congress with determining the status of individuals. Rather, it conveys extraterritorial privileges on soldiers who were serving on the base where Germaine was born. What was the year of the Treaty of Paris? The Treaty of Paris was in 1898, and it covered the Philippines, Guam, Puerto Rico, and Cuba. And so, we believe here that the court should look at the terms of the treaty applicable to the place of birth and find that Germaine should be considered to have the same extraterritorial status that his father, as a member of the Army, was given quite explicitly in the terms of the NATO Status of Forces Agreement. The key provisions of the NATO Agreement for the purposes of this case stated that members of the armed forces were not subject to any passport, visa, or immigration requirements as they were commissioned and sent overseas. They were explicitly told that they would not receive residence or domicile in the Federal Republic of Germany, and the treaty states that children – that Germany had no obligation under the terms of the treaty to even register the births of children born on that base. The treaty also has a provision that we believe extends the status of the father to the son, and that's when it defines members of the armed forces to include dependents. So the children of soldiers are themselves considered to be members of the armed forces. So we – if we were to rule in your favor, we would distinguish an unincorporated territory from a military base? Yes, Your Honor. I think that that is the critical distinction, and I think, you know, broadly speaking, looking at the territorial line of cases, no less the BIA's decision even in matter of – that's an area where Congress has legislated, and Congress has sort of filled the territorial ambit, if you will, with the incorporation doctrine. We've had 100-plus years of Congress regulating the status of inhabitants in the territories. Congress hasn't spoken to the issue of military bases, so your decision isn't challenging or undermining congressional action on that point. This is simply a different sphere that you're asked to consider here. And if we were not bound by the NOLOS case, and if it was distinguishable, we would just apply the constitutional, the common law, and go back to first principles, and your client would prevail. Is that correct? Yes, Your Honor. That's our position. And I do think that the D.C. Circuit's recent decision, it was decided a month ago, in Toowawa v. United States, can help guide the Court in its decision-making here, because what the D.C. Circuit did was say, yes, the Court should look back at the Insular Cases Analytical Framework, but we should update that framework given Supreme Court pronouncements on the case. The D.C. Circuit, I think, extrapolated three sort of principal circumstances or inquiries that the Court should make in determining whether the Citizenship Clause has extraterritorial application. First, it said the Court should make a pragmatic decision based on the objective factors and practical circumstances of the case. Secondly, it said the Court should look at the place in question and the relationship of that place to the United States. And then thirdly, the final inquiry is whether extending the Constitution or whether interpreting the Constitution in a way that encompasses a particular place would result in an impractical or anomalous result. But could one criticize the D.C. Circuit's recent opinion for being more of a, really an equity test, more of a looking at the parties rather than the text or the law? It doesn't seem to follow the same sort of analytical path. Yes, Your Honor. I think what the D.C. Circuit did well is frame the Insular Cases in the light and in the time in which they were decided. And the Insular Cases, looking back, were really quite pragmatic and sort of novel decisions. I mean, the Supreme Court at the time came up with the incorporation doctrine because it had no precedent for how to deal with territories recently acquired by the United States. In every case since then that has the same potential implications, I think the Court confronts this difficulty that you don't have an analogous, a perfectly analogous situation. The United States hadn't dealt with territories before. There's nowhere to look to for the answer with respect to a military base. So we can certainly- Is there some tension between your rigorous originalist position, constitutional position in this sort of pragmatic look at the circumstances of the times and the people approach that you would like us to analogize to in the D.C. Circuit? It seems to me that there's some tension between the two. You have two methods to prevail, perhaps, and there's some tension between the two. Your Honor, I don't think so because I think if we look back to the Fourteenth Amendment, what the D.C. Circuit really concluded is the phrase in the United States is ambiguous. It wasn't defined, and we can try to look to other provisions of the Constitution, it remains ambiguous. We can try to look to common law principles, but there are still questions raised there. So I think the courts are left with nothing other than attempting to come up with a framework. And the D.C. Circuit, I think, stays true to the oldest, if you will, framework that we have with the insular cases by saying that while that framework should be applied, we can't simply superimpose a conclusion from cases that dealt with territories in 1901 and had nothing to do with the citizenship clause onto American Samoa, which was before the D.C. Circuit, or on this case because there are just these critical differences that force the court to engage in a more complex analysis. I didn't realize that you were arguing that it was ambiguous. I thought you were arguing that under the constitutional test that your client is a citizen, you know, under the text and the history and tradition of the Constitution itself. But if you were arguing that it was ambiguous, then why don't we have to defer to the agency's position, some of the interpretive documents and that sort of thing? Yes, Your Honor. You don't have to defer to the agency's position in this case because the BIA or the D.C. Circuit doesn't have jurisdiction over constitutional claims. You know, we've spent years sort of in the immigration system in front of judicial bodies that have explicitly acknowledged that they haven't been able to consider my client's fundamental claim. And so it's really before this court that he's receiving the first real review or real consideration of that claim. We don't have to look to the State Department? No, Your Honor. You don't have to look to the State Department. Our position is that Congress, while it has asked the State Department to be involved in procedurally developing forms to make the statutes have practical application, Congress does not have authority to delegate the act of constitutional interpretation to the State Department. And specifically, and I noted this in my briefs, but the two sources that are cited as authority for the State Department's sort of blanket position on military installations bear no relation to military installations. In fact, military bases and installations are not mentioned in either the restatement of foreign law or in the Persinger v. Iran case that the State Department purports to rest its interpretation on. So we would ask this court instead to focus on the place of birth, the citizenship of Germain's father, his father's military service, because we believe it's relevant that he was sent abroad at the behest of this country while serving on active duty, the terms of And the fact that the Supreme Court has actually hypothesized about the facts of this case, they've never been asked to consider it, but I would point the court to Miller v. Albright, which is cited in my brief, and that case dealt with a statutory claim brought by the illegitimate daughter of an Air Force officer born in the Philippines. And that claim failed because under the statute, she was required to establish the biological relationship with the father, but was unable to do so. But the Supreme Court went on to hypothesize in the Miller decision that if the citizen parent, or if the relationship she had been able to prove to the citizen parent, if that parent had been a member of the Air Force and returned to the States at the end of the tour of duty, the statute would have been irrelevant and the petitioner, the child, would have become a citizen at birth by force of the Constitution itself. But in this case, if all of the facts were the same except that Mr. Thomas's father had been a civilian employee on the base, would that make a difference in your view? I believe it would, Your Honor, because I don't think that civilians are protected or included in the NATO Status of Forces Agreement in the same way. And I think the treaty is really what narrows and limits your holding here. This is a very specific case when the facts converge to, we believe, require the court to find that Mr. Thomas is a citizen, but it's a very unique set of facts and would not have implications for civilians who happen to be on military bases. I see that my time is almost up. Applying the Insular Cases Analytical Framework supports this court finding that the 14th Amendment extends to the birth of Jermaine Thomas. We have a child born on a United States Army base to this soldier and we have a treaty clearly tying his status as the dependent of that soldier to the status of his father. I believe you're just repeating what you've already said and you've saved your full time for- I have, Your Honor, yes. Thank you, Ms. Harris. Okay, thank you. Mr. Goldman? May it please the court, Dan Goldman on behalf of the Attorney General. The court should uphold the agency decision and deny the petition for review. There is only one issue before this court, as counsel has said. It's whether or not Mr. Thomas is a U.S. citizen. His arguments have narrowed, though, as this case has progressed. And now he comes to this court and he says, I am a citizen by virtue of my birth on a U.S. Army installation. His theory of citizenship is relatively narrow. Born on U.S. installation equals U.S. citizenship. That's the theory that he puts forward now before this court. The problem with that theory and why we would urge this court to reject that theory, there's several reasons. Number one, the citizenship clause of the 14th Amendment has not been extended beyond the territorial borders of the United States. As this court recognized, as Your Honor noted in the Nolos decision, Congress has filled in some of those gaps for children of American citizens born abroad. Congress has done that. Congress had several provisions, and one could have applied to Mr. Thomas in this case. But Sergeant Thomas did not have the requisite years of presence. So to say that Congress has not acted, I would respectfully disagree with counsel for Mr. Thomas. Congress has acted. Congress has said, we recognize that our service members are going to go overseas on orders, on active duty, and they may have children, or their spouses, their dependents may have children. And Congress has recognized that and filled in the gaps where the 14th Amendment citizenship clause does not apply. Second, if born on the installation equals U.S. citizenship, as Mr. Thomas suggests, the next logical step would be, as was noted earlier, the children of civilians, foreign nationals, would also get U.S. And as amicus noted in their brief, there are thousands in Germany alone, thousands of German nationals working on U.S. army, U.S. military installations. It's entirely conceivable that one of them could go into labor and not make it off. We certainly wouldn't want to be encouraging the military police to be shooing a woman who's in active labor, shoo her off post, just so that her child doesn't become a citizen. Ms. Herring's response to that is that this case falls under the NATO status of forces agreements. Could you address specifically that agreement and why you think it doesn't apply? I think the SOFA argument is limited. Just even a straight face test to suggest that all dependents, as was suggested by Mr. Thomas, spouses, children like Jermaine, are members of the armed forces. I would hope that we could at least agree on that, that a toddler is not a member of the U.S. Army. He did not raise his hand, he did not take the oath, he did not put on the uniform of this country. There may be other provisions of the SOFA that give someone like Jermaine or Jermaine's mother, the dependents of a service member, rights when their sponsor, the service member, is stationed on active duty in Germany or the other status of forces agreements all over the world. Korea, Japan, other places. But what the SOFA does not say is Jermaine is a citizen. That's not what it says, so I think the SOFA argument is limited. One of the other reasons, one of the other flaws in the theory of born on installation equals citizenship is that the converse then would raise problems. If born on the installation means U.S. citizenship, born off the installation would mean non-citizenship. There are service members serving overseas on orders, on active duty, just as Sergeant Thomas was, but they live off post. And if they're going to be racing down the autobahn to get to the maternity ward, that's a potential problem. There's also the fact that you have different installations, whether it's Germany, Korea, Japan, there might not be the maternity hospital on each individual installation. There might be a health clinic, but it's not set up to handle birth. So we could have a soldier, nine months pregnant on post A, goes into active labor trying to get to the maternity ward and is racing down the autobahn. Well, under Mr. Thomas's theory, if that soldier gives birth or the spouse of the soldier gives birth on the side of the autobahn, that child is not necessarily a U.S. citizen. How is that different than sending your spouse home, or trying to get the spouse into America, to territorial America, the 50 states, in order to make sure that, the fact that there's some scenario where somebody would be racing to try to get to a place also occurs here, doesn't it? I mean, I don't- I'm careful in answering that, Your Honor, but if the 14th Amendment, I don't think anyone disputes that it applies within the territorial borders of the United States. I don't, well, there's a problem in your hypo that you're right, that somebody could be racing down the autobahn. That you could also say, I'm going to send my spouse home, and we're going to separate families, and that sort of thing. And so, there's a problem, whichever practical problems, regardless. There is, Your Honor, there's a practical problem, and I want to make sure I'm understanding your question. In the continental United States, if a soldier is stationed up at Fort Polk, Louisiana, and that soldier, or the soldier's dependent spouse, has a child, that child is born within the territorial borders. Earth right citizenship. Earth right citizenship, no problems whatsoever. Whether or not this is more analogous to an unincorporated territory, or an incorporated territory, or whether or not, under the common law, all the land of the king, under the dominion, was, would be birthright citizenship. I want to ask you about Wong Kim Ark. Do you agree with the Supreme Court's characterization in that case, of the English common law rule of, and my Latin is, is, is terrible. Jews solely, under which anyone born within the dominion of the king was the subject of the king, and that that was the understanding of the framers at the time. If we go back to constitutional first principles, wouldn't this person be a birthright citizen? I would, I'm, I'm hesitating, Your Honor, only because what my, the thing that jumps out in memory about the, the Wong Kim Ark case is that it involved someone who was born within the continental United States, was born in, I believe, San Francisco. And. But they're discussing the English common law rule. Yes. So principles from English common law would say that, and assuming that that's what the founders and the framers understood, the person would be, in fact, a birthright citizen. Birth, birth, the, the general principle, I, I believe yes, Your Honor, is, is the short answer to your question, that generally the, the principle just, just solely born under the flag of citizenship conveys, but even as the, the D.C. Circuit noted in their decision last week. Birthright citizenship does not simply follow the flag. So there's been some, I hesitate to say limitations on what the Supreme Court has said, but there have been certainly some qualifications where the courts have recognized that simply being born on, in, in a place where the American flag might fly, does not convey birthright citizenship. And that's, that's an important distinction in, in this case, as there's, there's no dispute, really, as to any of the material facts. How do you distinguish this why is this more analogous to an unincorporated territory than an incorporated territory? There's no indication, Your Honor, that the, the base or the military installation is ever going to become a territory. I believe that's one of the definitions that's raised is that territories that are on the path towards statehood, potentially. There may be greater rights there. There's certainly no suggestion of that in this case, and, and this court can look, you know, no further than the front page of a newspaper or I guess the internet these days. There are militant- Is that close? Base is closed. Base is closed. We give back territory, whether it's Germany, Korea, Japan. We use it for a while. There are treaties that cover it, but then we give it back. And so someone who, under that, it's taken to a somewhat illogical conclusion. Someone who was born on a base in Germany, and if memory serves, I don't think that the US still controls the, the installation that Jermaine Thomas was born on. I may, I may be mistaken about that, but theoretically, you could have, hypothetically, you could have someone born on an installation that was controlled by the United States military. 20 years later, we cede it back, whether it's to a Germany, a Korea, a Japan. So you- Again. Why do you believe that it's analogous, though, to a territory, an incorporated territory, rather than US soil? Base is different than territory that you're trying to claim in the Philippines. Starting right there, Your Honor. There's, there's no indication that these military installations are on the path to statehood, and, and I, I don't think anyone has, has suggested that. And that's, again, one of the reasons underpinning the fact that the 14th Amendment Citizenship Clause has not been extended beyond the borders. And again, if Mr. Thomas's theory is correct, that born on the installation equates to birthright citizenship, Congress would not have needed to act as they did. Mr. Thomas almost benefited if he had been born, I think, even six months later. We wouldn't be having this discussion. If Sergeant Thomas had come to the United States a year or two earlier, we wouldn't be having this conversation. But Congress recognized that our service members are going to go overseas on orders. They are going to have children, or their dependents will have children, and Congress filled in some of those gaps. Most, most of the children of service members are going to be covered in that first exception. Both, both parents, US citizens, had a prior residence in the US, no questions asked. This, we're getting down to the- If we had to apply to Tawana, would you lose? No, Your Honor, I don't think, I don't think we do. Your Honor, what Tawana said, again, a birthright citizenship does not simply follow the flag. I think under that- They looked at the intent of the parties. They looked at the intent of the parties. They're very different than the- They also, they also looked, Your Honor, at, I think, the expression of the populace through its elected officials. That very much distinguishes American Samoa from a military installation where we don't have a governor, elected representatives. In, in the Tawana case, if, if memory serves- Don't you have American leaders of the military? You have American military leaders. They're not elected, Your Honor. I mean, it's the old, it's the old saying that the American military is there to protect democracy, but not necessarily to practice it. Right, but using the idea that you look at what the people are doing, what the people are intending while they're there, it's very much an allegiance to America. I had- An intent to be associated with America. Absolutely, Your Honor, and that's why Congress looked at this situation and Congress chose to act. Congress could have said- Right, but I'm asking if you just apply the Tawana test, it seems like the factors cut in favor of citizenship. I, I, I would respectfully disagree with that, Your Honor. What factor in Tawana does not cut in favor of citizenship? What Tawana said, Your Honor, is on the key question in this case, does the 14th Amendment citizenship clause extend beyond the territorial borders of the United States? They said, no, we need to do more. We need to have further analysis. The further analysis is what separates this case from Tawana. In Tawana, you've got American Samoa. There's statutory provisions passed by Congress that Tawana was trying to get in their challenge. In this case, you do have congressional action. You have Congress speaking and providing for that previously 10 years presence in the United States requirement. It's been shortened to five years. So Congress, contrary to what was stated earlier, Congress has acted. Congress has recognized that this situation can exist. What Congress did not do, however, was to say all children of U.S. service members born abroad get birthright citizenship. Congress could have done that. Congress certainly knows that we're putting service members abroad. And Congress could have chosen to act and convey citizenship through the Immigration and Nationality Act. They did not do that. What they did was to recognize if someone in Sergeant Thomas's position has a certain number of years of presence in the United States, then citizenship would convey. And they recognized, and they gave full credit, Congress did, to Sergeant Thomas's time in uniform. So Congress, I think, has recognized this type of situation. Did this court be concerned at all that this makes Mr. Thomas a citizen of no place? Your Honor, I think that's a compelling, equitable type of question, runs parallel, and is not part of this decision. Mr. Thomas could have stayed. But we should not consider that, because we're not acting in equity here. We should not consider that at all, that he's not going to be a citizen anywhere? Your Honor, this case is not about where he may go. It's about whether he gets to stay. And that's the bottom line in this case. This removal order says he's not a United States citizen. He's an aggravated felon. Therefore, he is removable from the United States as a legal matter. That's the issue before this court. The question that you're raising, which is certainly an important question, is what happens after this court acts? If this court upholds the agency decision, finds that Mr. Thomas is not a U.S. citizen, then it goes to the agency. And the agency is going to follow 8 U.S.C. section 241b2e of the INA, which says where do we remove someone to? In immigration court, the alien has the opportunity to designate a country. If the alien doesn't designate, the immigration judge can designate. But if those countries ultimately can't take the individual, or won't take, or won't take the individual, then the agency is going to have to do their due diligence in this case. And that's why we cited in our brief the Seventh Circuit's decision in Jamal Daoud. That was an Iraqi case, Iraqi case in the early 2000s. And the court, the Seventh Circuit was concerned with the question, are we actually, at that time, removing people to Iraq? And the answer that the Seventh Circuit was given by the government and ultimately included in their decision made clear that where the individual may go is a separate question. The question before this court, as it was before the Seventh Circuit in Jamal Daoud, was does the individual get to stay? Is the individual removable? Has the individual committed removable criminal offenses? Or in that case, I believe it was an asylum case, does the individual qualify for asylum? But the ultimate question that you're getting to, Your Honor, does that individual ultimately get removed, in that case, to Iraq? In this case, whether it's Jamaica, Germany, Kenya, or some other country. I don't really think that that's the, I agree with you that that's not a question for the court. The question for the court is, should it play a role that to rule in your favor would to make him a citizen of nowhere? Should that play a role in the decision making? We shouldn't construe congressional intent or original constitutional federal common law in a way to have that result. That that should be, we should construe against that if it's up in the air. Your Honor, I don't think this court has to conclude that Mr. Thomas is stateless in order to rule in the government's favor. And I hope that answers your question. But this court could issue the same, I believe it was even a footnote, in the Gibaldo decision, could follow the Seventh Circuit's lead in that case and say, in upholding the agency decisions here, we are not deciding the statelessness question because it's not before us. This court could simply follow that. I think it bears noting as well, Mr. Thomas could have stayed in the United States for the rest of his life. The briefs from Mr. Thomas, from Amicus, talk about but for Sergeant Thomas' service, we wouldn't be having this discussion. He wouldn't be subject to removal. And I would just ask this court to recognize that that is at best part of the story. Mr. Thomas is subject to removal because he committed multiple criminal offenses. But for those actions by Mr. Thomas, not his father, not his mother, not the United States government, but for Mr. Thomas' actions, he could have lived here for the rest of his life. If he had conditional residence, it converted over to lawful permanent residence. Could I ask you about Judge Pragerson's dissent that started in the Raban case? He has a real historical analysis that recognizes the dissent. And then we've had a series of other cases. What is wrong with the constitutional analysis in that dissent? Your Honor, I want to be careful because I don't have. I don't remember Judge Pragerson's dissent. But I think simply the short, and I don't doubt that or disrespect Judge Pragerson's decision or dissent. But this court disagreed with the dissent in this case, in that case rather. This court in Nolos agreed with the majority in Raban and did not follow Judge Pragerson's dissent. And it brings us back to really the only question before this court. Does the 14th Amendment Citizenship Clause go beyond the borders? Counsel for Mr. Thomas today was questioned about that and at one point said that that phrase is ambiguous and then sort of scaled that back. We would respectfully suggest that the Constitution, the 14th Amendment Citizenship Clause does not apply. Congress has recognized that it is not going to apply in every situation. It's not going to apply in situations exactly like this one and that's why Congress acted. That's why Congress tried to give Mr. Thomas the benefit of his father's presence in the United States Army overseas. He didn't qualify. I understand that that's a hard result sometimes to accept. But that is the government's position and we would urge the court to deny the petition for review. All right, thank you, Mr. Goldman. Thank you, Your Honor. Mr. Herring, you've saved time for rebuttal. Thank you, Your Honor. I'd just like to address a few points. With respect to the hypotheticals posed by government's counsel, civilians, people trying to run on the base. I think it's just important to keep in mind that the 14th Amendment Citizenship Clause has two prongs. It requires someone be both in the United States and subject to the jurisdiction thereof. And I think that jurisdictional component is not really at issue in this case necessarily, but certainly would be if the court were asked to consider the status of a civilian who just showed up on the base and gave birth to a child there. That foreigner would not be subject to the jurisdiction of the United States. I also just wanted to note that we're not just saying any child born on a base- Well, if that foreigner were to commit a crime on the base, that would be subject, would it not to some sort of jurisdiction, military or otherwise? I think that that is actually a base-by-base analysis, and it would depend on the status of forces agreement in effect in that place. The NATO treaty is somewhat unique because it's the only status of forces agreement that was actually ratified as a treaty. Subsequent status of forces agreements in Iraq and Afghanistan are executive agreements. And I think that would present a completely different legal analysis to the court that was called upon to consider such an agreement there. And it would depend on the actual provisions governing civilians and members of the services in those unique situations. So we're definitely not proposing that any birth on any base automatically qualifies someone. We would ask the court again to look at the unique facts of this case. And just to address the question regarding statelessness, I believe that that does come into play because it's one of the factors that would be considered if the court conducts this pragmatic analysis. The ultimate question the DC Circuit asked in Toowah was whether the result of a decision one way or the other would lead to an impractical and anomalous result. And I think that in this case, the court certainly has to consider the constitutional impropriety that might arise in interpreting the 14th Amendment in a way that leaves the son of a soldier stateless. That is relevant. In all of the other territory cases in American Samoa, the individuals have a fallback status. And I think that the courts take that into account. Congress has acted. Congress has made these individuals nationals. That is the status they've been given. Germaine simply doesn't have that here. And it is quite an anomalous result to find that a child who was born on this base solely because his father was following orders to serve there during a war time belongs to no country and doesn't belong to this country. Sergeant Thomas- There's nothing, there was nothing ordained about that. I mean, if he had gone through the hoops, he would have been a citizen. No, Your Honor. There was a procedure for that. He, well, there are two statutes that could apply. The statute referenced by the government is 8 U.S.C. 1401G, which requires the father have ten years of physical presence in the United States prior to the child's birth. And there was nothing that Sergeant Thomas could have done to give himself more time here. The other statute I think that Your Honor refers to is the request that a parent can make for a certificate of citizenship. And that is correct, and Mr. Thomas' father could have done that. Unfortunately, the problem with that statute for the child is that it places the onus on the parent to follow through, to submit this application. Well, Sergeant Thomas, we don't have, there's nothing in the record about why he did or didn't do that. He continued on active duty for over a decade after Jermaine was born. We don't know when he entered the United States. Again, that's not in the record. But the result is that punishing the child for his father's failure to act when Sergeant Thomas couldn't control where Jermaine was born. It's our contention that it was the United States government that controlled that. And that's why we're asking this court now to declare that Jermaine Thomas is a United States citizen. If the court has no further questions, that's all I have. Thank you, Ms. Herring. Your case is under submission. Thank you. Next case, Box versus Dallas Mexican Consulate General.